IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

No. 22-4656(L), 22-4659, 22-4669, 22-4670
22-4684, 22-4685

―――――――――

UNITED STATES OF AMERICA,
*Appellee*,
v.

MOISES ZELAYA-VELIZ, SANTOS ERNESTO GUTIERREZ-CASTRO,
JOSE ELIEZAR MOLINA-VELIZ, LUIS ALBERTO GONZALES,
GILBERTO MORALES, JONATHAN RAFAEL ZELAYA-VELIZ
*Appellants*.

―――――――――

Appeal from the United States District Court
for the Eastern District of Virginia at Alexandria
*The Honorable Anthony J. Trenga, District Judge*

―――――――――

BRIEF OF THE UNITED STATES

―――――――――

Jessica D. Aber
United States Attorney

Maureen C. Cain
Assistant United States Attorney
2100 Jamieson Ave
Alexandria, Virginia 22314
703-299-3700

*Attorneys for the United States of America*

**Table of Contents**

Table of Authorities ................................................................ iv

Introduction ......................................................................... 1

Issues Presented .................................................................... 3

Statement of the Case............................................................. 3

    A. Procedural History ....................................................... 3

    B. Summary of the Facebook Search Warrants .................................... 6

        a.      Facebook Search Warrants Tied to Luis Alberto
                 Gonzales, a/k/a Luis Figo, a/k/a China, a/k/a Chinita ....... 6

        b.      Facebook Search Warrant Tied To Moises
                 Zelaya-Veliz, a/k/a Moizes Zelaya Bonilla, a/k/a
                 Zelaya Hernandes ............................................ 15

        c.      Facebook Search Warrants Tied To The Remaining
                 Appellants.................................................. 19

        d.      Suppression Hearing on the  Facebook Search
                 Warrants .................................................... 20

        e.      Testimony and Evidence Presented at Trial.................... 22

         i.   Testimony Related to the Sex Trafficking of Minor-2
            Committed by Moises Zelaya-Veliz and Jose Eliezar
            Molina-Veliz ............................................. 235

ii.     Testimony Relating to the Sex Trafficking of Minor-2 Committed by Santos Ernesto Gutierrez-Castro .............24

iii.    Evidence Corroborating the Sex Trafficking of Minor-2 by Defendants in Early to Mid-September 2018..................................................................................25

iv.    Testimony Relating to the Sex Trafficking of Minor-2 Committed by Gilberto Morales, Luis Gonzales, Jonathan Zelaya-Veliz and Others ..................................27

v.    Evidence Corroborating the Sex Trafficking of Minor-2 by Multiple Defendants in Mid-September 2018..................................................................................29

vi.    Testimony Tied To The Continued Sex Trafficking of Minor-2 .......................................................30

vii.    Evidence Corroborating the Sex Trafficking of Minor-2 by Multiple Defendants In Late September through October 11, 2018 ..............................31

viii.   Testimony of Gang Expert Detective Ray Betts..............32

ix.  Testimony of Dr. Shannon Wolf, Ph.D., ..................................................................................33

x.  Testimony of Dr. Katherine Deye, M.D. ............................33

Summary of Argument ........................................................34

Argument...............................................................................35

I. The District Court Did Not Err When It Denied Defendant's Motions To Suppress Facebook Evidence Evidence ……………………………….35

A.  Standard of Review.......................................................35

B.  Analysis.........................................................................36

a) A sufficient Nexus Existed Between The Facebook Accounts And The Crimes Under Investigation ............................................37

b) The Facebook Search Warrants Did Not Authorize An Unparticularized Or Overbroad Seizure........................................41

c) The Types of Data Sought From Facebook Were Not Overbroad ..................................................................................42

d) The Time Range Sought Was Not Overbroad..............................45

e) The Cases Relied Upon By Defendants Do Not Involve Investigations As Complex Or Lengthy As The Investigation Underlying the Current Case .......................................................48

f) Even if the Warrants Were Overbroad, the Doctrine of Severance Applies ..............................................................52

g) Even if the Warrants Were Flawed, The Good Faith Exception Applies..........................................................53

h) Even if the District Court Erred In Its Suppression Rulings, Such Errors Were Harmless As to Luis Gonzales and Gilberto Morales................................................................54

II. The District Court Did Not Err When It Denied Gutierrez-Castro's Motion for Judgment of Acquittal ....................................................55

A. Standard of Review..............................................................55

B. Analysis .............................................................................56

Conclusion ..............................................................................57

Statement Regarding Oral Argument .....................................................58

Certificate of Compliance ..........................................................59

Certificate of Service ................................................................60

# Table of Authorities

Page(s)

Cases

*Andresen v. Maryland,*
   427 U.S. 463 (1976) ..................................................................42

*Burns v. United States,*
   235 A.3d 758 (D.C. 2020) ..........................................................48

*Illinois v. Gates,*
   462 U.S. 213 (1983) ............................................................. 36, 37

*Messerschmidt v. Millender,*
   565 U.S. 535 (2012) ..................................................................39

*United States v. Aboshady,*
   951 F.3d 1 (1st Cir. 2020) .........................................................44

*United States v. Abu Ali,*
   528 F.3d 210 (4th Cir. 2008) .....................................................55

*United States v. Alford,*
   744 Fed App'x 650 (11th Cir. 2018) ..........................................45

*United States v. Allen,*
   2018 WL 1726349 (D. Kan. Apr. 10, 2018) ........................ 46, 53

*United States v. Anderson,*
   851 F.2d 727 (4th Cir. 1988) .....................................................37

*United States v. Blake,*
   868 F.3d 960 (11th Cir 2017) ............................................ 49, 51, 53

*United States v. Blakeney,*
   949 F.3d 851 (4th Cir. 2020) ............................................ 41, 42, 52

*United States v. Burgos*,
94 F.3d 849 (4th Cir. 1996) ...................................................................55

*United States v. Burkhow*,
2020 WL 589536 (N.D. Iowa Feb. 6, 2020) .......................................53

*United States v. Castro*, 881 F.3d,
961 F.3d 964– (6th Cir. 2018) ...............................................................41

*United States v. Chavez*,
423 F. Supp. 3d 194  (W.D.N.C. 2019) ................................................53

*United States v. Cobb*,
970 F.3d 319 (4th Cir. 2020) ...................................................... passim

*United States v. Daprato*,
2022 WL 1303110 (D.Me. 2022) ..................................... 40, 43, 44, 53

*United States v. Ford,*
986 F.2d 57 (4th Cir. 1993) ...................................................................54

*United States v. Franklin*,
2022 WL 3572697 (W.D.Mo. 2022) ........................................... 44, 53

*United States v. Gallimore*,
247 F.3d 134 (4th Cir. 2001) .................................................................55

*United States v. Grossman*,
400 F.3d 212 (4th Cir. 2005) .................................................................37

*United States v. Johnson*,
437 F.3d 69 (D.C. Cir. 2006) .................................................................41

*United States v. Jones*,
942 F.3d 634 (4th Cir. 2019) .................................................................37

*United States v. Jones*,
952 F.3d 153 (4th Cir. 2020) .................................................................50

*United States v. Jordan*,
2023 WL 2947433 (4th Cir. 2023)......................................................38

*United States v. Kvashuk*,
29 F.4th 1077 (9th Cir. 2022).........................................................37

*United States v. Leon,*
468 U.S. 897 (1984) ...................................................................53

*United States v. Liburd*,
2018 WL 2709199 (E.D.N.Y. June 5, 2018)........................................44

*United States v. Manafort*,
323 F. Supp. 3d 768 (E.D. Va. 2018)................................... 41, 46, 50

*United States v. Martin,*
2021 WL 248671 (4th Cir. 2021).....................................................38

*United States v. Ortiz*,
669 F.3d 439 (4th Cir. 2012)..........................................................36

*United States v. Pugh*,
2015 WL 9450598  (E.D.N.Y. Dec. 21, 2015) ....................................51

*United States v. Ray*,
541 F. Supp. 3d 355  (S.D.N.Y. May 26, 2021)............................ 51, 53

*United States v. Shah,*
2015 WL 72118 (E.D.N.C., Jan. 6, 2015)..........................................45

*United States v. Sharp,*
2015 WL 4641537 (N.D. Ga. Aug. 4, 2015)................................ 40, 45

*United States v. Shipp,*
392 F. Supp. 3d 300 (E.D.N.Y. 2019)...............................................48

*United States v. Skinner*,
2021 WL 1725543 (E.D.Va. Apr. 29, 2021)........................................44

*United States v. Sueiro,*
   59 F.4th 132 (4th Cir. 2023) ......................................................... 35, 37

*United States v. Ulbricht,*
   858 F.3d 71 (2d Cir. 2017) ................................................................51

*United States v. Westley,*
   2018 WL 3448161 (D. Conn. July 17, 2018) ....................................45

*United States v. Wienke,*
   733 F. App'x 65 (4th Cir. 2018) .......................................................38

*United States v. Williams,*
   548 F.3d 311 (4th Cir. 2008) ...........................................................38

*United States v. Williams,*
   592 F.3d 511 (4th Cir. 2010) ..................................................... 41, 50

*United States v. Winn,*
   79 F. Supp. 3d 904 (S.D. Ill. 2015) .................................................49

*United States v. Young,*
   260 F. Supp. 3d 530 (E.D.Va. 2017) ...................................... 42, 43, 46

Statutes

District of Columbia, Section 22-2201 .....................................................49

Title 18, United States Code, Section 922(g) ............................................48

Title 18, United States Code, Section 1591 ..............................................15

Title 18, United States Code, Section 1591(a) .................................... 3, 4, 5

Title 18, United States Code, Sections 1591(a), (b)(1), (c) ....................3, 4

Title 18, United States Code, Sections 1591(a), (b)(1), (c) and 2 ............4

Title 18, United States Code, Section 1594(c) .......................................3, 4

Title 18, United States Code, Section 1952 ..................................................15

Title 18, United States Code, Section 1959 ..................................................19

Title 18, United States Code, Section 1959(a)(3) ...................................3, 4

Title 18, United States Code, Sections 1959(a)(3), (a)(6), and 2 ............4

Title 18, United States Code, Section 2422(a) ...........................................15

Title 18, United States Code, Section 2423(a) ......................................4, 15

Title 18, United States Code, Sections 2423(a) & (e) ..............................3

Rules

Federal Rule of Criminal Procedure 29 ....................................... 2, 3, 5, 6

# Introduction

Defendants are members and associates of the criminal street gang MS-13 who worked together to sex traffic 13-year-old victim Minor-2 after she ran away from a residential facility with Minor-3.  While being sexually exploited by defendants, Minor-2 was beaten with a baseball bat 26 times on two separate occasions as a form of a gang initiation and punishment.  After both beatings, Minor-2 continued to be sold for sex by defendants and other co-conspirators in exchange for cash and drugs throughout Northern Virginia and Maryland.

Through witness interviews, law enforcement learned of a variety of crimes committed by multiple members and associates of MS-13, including, but not limited to, the physical and sexual exploitation of Minor-1, Minor-2, and Minor-3. After Minor-2 was recovered by law enforcement, she was unable to identify by full name numerous individuals involved with her gang-sanctioned bat beatings and sexual abuse.  She was also unable to identify all of the locations where she was harbored for purposes of exploitation.  She was able, however, to identify numerous perpetrators via photographs seen over Facebook.

Over the course of several months, law enforcement swore out four federal search warrants on a rolling basis for Facebook accounts connected to defendants, additional co-conspirators, and the three minor victims.  The Facebook search warrant returns provided evidence of the full identities of defendants and other co-

conspirators, the locations of where the crimes were committed, along with communications, photographs, and videos showing that Facebook was used as an instrumentality of the offenses under investigation.

After obtaining evidence from numerous sources, the United States brought criminal charges against eleven defendants related to the gang-sanctioned beatings and sexual exploitation inflicted upon Minor-2.

Prior to trial, five of the above-captioned defendants moved to suppress Facebook evidence, arguing lack of probable cause, lack of particularity, and overbreadth as to the categories and time range of data sought to be disclosed from Facebook. Defendants argued the time range should have been limited to the charged time frame of Minor-2's exploitation from between August 27 through October 11, 2018. The district court denied the motions to suppress.

A jury trial commenced against seven defendants on June 1, 2022. After the seven-day trial, the jury convicted the above-captioned defendants of conspiracy to sex traffic a minor under the age of 14, sex trafficking a minor, and/or conspiracy to transport a minor across state lines for purposes of prostitution or other illegal sexual activity. Defendants moved to acquit pursuant to Federal Rule of Criminal Procedure 29. Their motions were denied.

## Issues Presented

1.     Whether the district court erred when it denied defendants' motions to suppress Facebook evidence.

2.     Whether the district court erred when it denied Gutierrez-Castro's motion for judgment of acquittal under Rule 29.

## Statement of the Case

### A.  Procedural History

On August 27, 2020, a grand jury sitting in the Eastern District of Virginia returned a five-count indictment against eleven defendants charging them with assault with a dangerous weapon in aid of racketeering activity in violation of 18 U.S.C. §§1959(a)(3) and/or child sexual exploitation offenses in violation of 18 U.S.C. §§1591(a), (b)(1), (c), 1594(c) and 2423(a) & (e).  (J.A.18-19).

On April 19, 2022, a grand jury returned a superseding indictment against multiple defendants, including the seven defendants who ultimately went to trial in this matter as follows: (1) Moises Zelaya-Veliz, a/k/a Moizes Zelaya Bonilla, a/k/a Zelaya Hernandes;  (2) Jose Eliezar Molina-Veliz, a/k/a Jose Eliezar Hernandez; (3) Santos Ernesto Gutierrez-Castro, a/k/a Gutierrez Hernestho; (4) Luis Alberto Gonzales, a/k/a Luis Figo, a/k/a China, a/k/a Chinita; (5) Jonathan Rafael Zelaya-Veliz, a/k/a Jonathan Zelaya; (6) Gilberto Morales, a/k/a Chapin, a/k/a Chucha; and (7) Reina Hernandez, a/k/a Elizabeth Hernandez.  (J.A.181-196).

Count Four of the Superseding Indictment charged the seven defendants with conspiracy to sex traffic a minor under age 14 or a person via force, fraud, and coercion in violation of 18 U.S.C. §§ 1591(a), (b)(1), (c) and 1594(c).[1] Count Five charged all seven defendants with sex trafficking a minor under age 14 or a person via force, fraud, and coercion in violation of 18 U.S.C. §§ 1591(a), (b)(1), (c) and 2. Count Six charged five defendants with conspiracy to transport a minor across state lines for purposes of prostitution or illegal sexual activity in violation of 18 U.S.C. § 2423(a) and (e).[2] The charged time frame for the above-three counts was August 27 through on or about October 11, 2018. (J.A.181-196).

Prior to trial, co-defendant Sioni Alexander Bonilla Gonzalez, a/k/a Sonic, pled guilty to two counts of assault with a dangerous weapon in aid of racketeering activity in violation of 18 U.S.C. §§ 1959(a)(3) and 2. (J.A.50). Co-defendants Nelson Caballero Portillo and Orlando Alexis Salmeron Funez, a/k/a "Alexis Salmeron," pled guilty to sex trafficking a minor under age 14 or a person via force, fraud, and coercion in violation of 18 U.S.C. §§ 1591(a), (b)(1), (c) and 2. (J.A.349-50, 567-68). Pursuant to the terms of their plea agreements, Caballero

---

[1] Counts One through Three charged a co-defendant, Carlos Jose Turcios Villatoro, a/k/a Jose Funes, a/k/a Guzman Antonio, with assault with a dangerous weapon in aid of racketeering activity and the conspiracy to commit such offenses in violation of 18 U.S.C. §§ 1959(a)(3), (a)(6), and 2.

[2] Gilberto Morales and Reina Hernandez were not charged in Count Six.

Portillo and Salmeron Funez agreed to cooperate with the United States and testified during trial. (*Id.*).

Motions to suppress Facebook evidence were filed by all defendants except Gutierrez-Castro. (J.A.22-23, 27). After briefing and two hearings, the district court held the Facebook search warrants were supported by probable cause, were sufficiently particular, and were not overly broad. (J.A.64-179). The district court further held, in the alternative, that good faith reliance applied. (J.A.121-22, 147).

Over the course of seven days, the United States presented its case through multiple witnesses and numerous forms of evidence. Gutierrez-Castro and the other defendants moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. (J.A.43). The district court reserved judgment on the motions. (*Id.*).

The jury deliberated for three days and reached a verdict. (J.A.43-44). In reaching its verdict, the jury filled out verdict forms as to each defendant.[3] (J.A.1280-94). As to Count Four of the Superseding Indictment charging the defendants with conspiracy to sex traffic a minor or sex trafficking an individual by force, fraud, and coercion, the jury found the above-captioned defendants

---

[3] Per the direction of the district court, the verdict forms and jury instructions referred to Count Four of the Superseding Indictment as "Count One," Count Five of the Superseding Indictment as "Count Two," and Count Six of the Superseding Indictment as "Count Three."

guilty.[4]  (*Id.*).  As to Count Five, the jury found each defendant guilty of sex trafficking a minor under the age of 14.[5]  (*Id.*)  In the special verdict form, the jury also found Gonzalez guilty of sex trafficking Minor-2 via force, fraud, and coercion.  (J.A.1287).  As to Count Six, the jury found the five charged defendants guilty of conspiracy to transport a minor across state lines for purposes of prostitution or illegal sexual activity.  (J.A.1280-87, 1292-93).

After trial, the district court set a briefing schedule on Rule 29 or other post-trial motions.  (J.A.44).  The defendants did not file additional briefing.  On October 7, 2022, the district court denied the oral Rule 29 motions.  (J.A.51-52).

### B. Summary of the Facebook Search Warrants

#### a. Facebook Search Warrants Tied to Luis Alberto Gonzales, a/k/a Luis Figo, a/k/a China, a/k/a Chinita

On June 5, 2019, the Honorable Ivan D. Davis signed a search warrant authorizing the FBI to search Facebook accounts tied to Gonzales and co-defendant Reina Hernandez.  (J.A.1380-1427).[6]  As described in the affidavit, FBI SA Jeremy Obie and other local police departments were investigating the activities of the

---

[4] The jury found co-defendant Reina Hernandez not guilty as to Count Four.

[5] The district court subsequently set aside the jury's conviction as to defendant Hernandez.

[6] A similar Facebook search warrant was presented by SA Obie and signed by the court previously in this investigation.   Specifically, on March 14, 2019, the Honorable John F. Anderson signed a search warrant authorizing a search of four Facebook accounts tied to co-defendant Sioni Alexander Bonilla Gonzalez, a/k/a Sonic.  (J.A.1353-1379).

transnational criminal street gang Mara Salvatrucha (MS-13). (J.A.1402, ¶ 33). The investigation involved the sexual exploitation and/or sex trafficking of Minor-1, Minor-2, and Minor-3 by members and associates of MS-13. (J.A.1402, ¶¶ 33-34).

Based on SA Obie's training and experience, MS-13 gang members are required to commit acts of violence to further the interests of the gang, including against those who violate gang rules. (J.A.1402, ¶ 33). MS-13 gang members also plan and execute illegal activities to generate money for the gang, including, but not limited to, prostitution and the distribution of narcotics. (*Id.*). The affidavit provided information on how gang members and other individuals involved in commercial sex rings frequently operate and how social media is frequently used to advance their criminal activities. (J.A.1399-1401, ¶¶ 30a-30g, 31-32). Based on training and experience, individuals engaged in prostitution often use electronic means such as Facebook to post advertisements of the females and to communicate with clients and prostitutes. (J.A.1401, ¶ 31). Gang members often post photographs that correspond with the location of where commercial sex acts are occurring. (*Id.*). MS-13 gang members and associates often use cell phones and messaging applications such as Facebook to communicate with one another before, during, and after engaging in criminal activities. (J.A.1401, ¶ 32). The affidavit described the use of those messaging applications by MS-13 gang members and associates to coordinate their

crimes, and to photograph and/or video-record themselves with their fellow conspirators and the instruments used in committing the crimes. (*Id.*).

The affidavit also provided information about Facebook data and incorporated Attachments A and B. (J.A.1392, ¶ 4; J.A.1395-1399, ¶¶15-29). The affidavit provided, *inter alia*, information about the registration process for Facebook, including potential identity evidence that can be located (J.A.1395, ¶ 16); Facebook "friends" and groups that allow individuals to interact and communicate (J.A.1395, ¶ 18); the types of data that may be posted on an individuals' Facebook wall including videos, photos, and "status updates" (J.A.1396, ¶ 19); the ability for users to communicate via private messaging on Facebook (J.A.1397, ¶ 21); notifications that can be sent among acquaintances through "pokes," (J.A.1397, ¶ 23); classified ads that can be posted in the Facebook Marketplace (J.A.1397, ¶ 24); subscriber information related to the length of service, payment information, IP address information, and communications between the account user and others. (J.A.1398-99, ¶¶ 27-28).

The affidavit further described the sexual exploitation of Minor-2. Around June 11, 2018, Minor-2 was recovered in an apartment stairwell by police in Maryland. (J.A.1402, ¶ 35). Minor-2 reported she met a male on Facebook who, together with another man, drove her from Virginia to Maryland and took her to a hotel. (*Id.*). One of the men was affiliated with MS-13. (*Id.*) When Minor-2 refused

to engage in sexual activity with one of the men, the man threatened her with violence. (*Id*.).

The affidavit further described Minor-2 running away with Minor-3 from a housing facility on August 27, 2018. (J.A.1403, ¶ 36). Minor-3 was known to have ties to MS-13. (J.A.1403, ¶ 38). While law enforcement was working to recover them, both minors were briefly sighted in Woodbridge, Virginia during a shoplifting incident. (*Id*.). While Minor-2 was missing, Fairfax County Police obtained a search warrant for the contents of Minor-2's Facebook account. (J.A.1403, ¶ 39). The search warrant return revealed conversations between Minor-2 and others setting up sexual encounters in exchange for money via Facebook. (*Id*.). The Facebook communications were dated from June through September 24, 2018. (*Id.*). The affidavit included a specific Facebook conversation between Minor-2 and an adult male regarding commercial sexual activity dated September 12, 2018. (J.A.1403, ¶ 40). In the messages, Minor-2 indicated she was at a specific address in Woodbridge, Virginia. (*Id*.).

On October 11, 2018, law enforcement recovered Minor-2 near 3350 Chillum Road, Mt. Rainier, Maryland, outside an apartment complex known as the Queenstown Apartments. (J.A.1404, ¶ 41). After Minor-2's recovery, she was interviewed by law enforcement. (J.A.1404, ¶ 42). She reported that she and Minor-3 went to a residence in Woodbridge where they met up with numerous MS-13 gang

members after they had run away together. (J.A.1404, ¶ 46-51). Minor-2 reported being beaten with a metal baseball bat 26 times by at least four members of MS-13 in a residential garage in Woodbridge, Virginia as part of a gang initiation. (J.A.1405-06, ¶¶ 46-51). About ten people were present in the garage, including Minor-3 and Minor-1. (J.A.1406, ¶¶ 49-50). Minor-2 was only able to identify two of the four people who beat her. (J.A.1406, ¶ 49). She knew the names of the two individuals as Sonic and Jose. (*Id*.).

After the first bat beating, Minor-2 was taken to a nearby residence in the Summerland Apartment complex in Woodbridge. (J.A.1406, ¶ 51). Law enforcement showed Minor-2 a photograph they had located in her Facebook private messages. (J.A.1406-07, ¶ 52). After seeing the photo, Minor-2 believed the location of that photo was Moises Zelaya's apartment after the first beating. (*Id*.). Moises was a member of MS-13 and knew she had been beaten. (*Id.*).

Minor-2 reported being beaten a second time with a bat by MS-13 gang members in the same residential garage as punishment for using Jose's phone. (JA1407, ¶ 54). Multiple people were again involved but she only knew the names of two of the individuals as Sonic and Jose. (*Id*.).

Corroborating Minor-2's statements, the affidavit described communications recovered from the Facebook account of Bonilla Gonzalez, a/k/a Sonic, from a prior federal search warrant obtained in March 2019. (J.A.1413, ¶ 74). In Facebook

communications with another individual, Sonic discussed beating a female with a baseball bat on or about September 21, 2018. (J.A.1413-15, ¶ 74). Similar evidence was recovered in Minor-2's Facebook account with group conversations about her bat beating, along with a circulated photograph of her bruised buttocks. (J.A.1411-12, ¶¶71-72).

After the second bat beating, Minor-2 eventually went back to the residence of Moises and stayed there for about 4-6 days. (J.A.1408, ¶ 56). While there, Minor-2 asked for ice to put on her legs. (*Id.*). Moises' wife, Wendy, asked Minor-2 what happened to her. (*Id.*). Minor-2 was instructed to lie out of fear that Wendy would go to the police. (*Id.*).

While at Moises' apartment, the gang planned to take Minor-2 to Maryland. (J.A.1408, ¶ 56). Sonic and Jose said they were going to drop Minor-2 off in Maryland with Moises' family member. (J.A.1408, ¶ 57). Sonic and Jose took Minor-2 to an apartment in what she believed to be Hyattsville, Maryland. (*Id.*). When Minor-2 arrived at the apartment, she saw Reina and Luis. (*Id.*). Luis was a member of MS-13. (J.A.1411, ¶70).

Minor-2 was sent to a room in the apartment. (J.A.1408, ¶ 58). While in the room, she could hear Reina, Sonic, and Luis talking about her. (*Id.*). She heard Sonic tell them that Minor-2 would make the gang more money than a specific female's name (a name associated with both Minor-1 and Minor-3). (J.A.1408-09,

¶ 58).  Not long after, multiple men came to the apartment and engaged in sexual activity with Minor-2.  (J.A.1409-10, ¶¶59-66).  That first night, about 5-6 men had sex with Minor-2.  (J.A.1410, ¶ 66).

The following days, Reina and Luis set up "prostitution dates" for Minor-2.  (J.A.1410,  ¶ 67).  Before seeing customers, Luis gave Minor-2 alcohol and drugs including marijuana and cocaine.  (J.A.1410, ¶ 68).  Minor-2 believed she was at Reina's place for about two weeks. (J.A.1410, ¶ 67).

Reina and Luis gave Minor-2 a phone and told her they could see anyone she called or texted.  (J.A.1411, ¶ 70).  Luis stated there were many gang members around the apartment complex and they would find her if she ran away.  (*Id.*).

Law enforcement seized Minor-2's cell phone when she was recovered on October 11, 2018.  (J.A.1415-16, ¶ 75.)  Law enforcement issued a subpoena to obtain subscriber information and toll records connected to the cell phone.  (*Id.*).  The cell phone was activated on October 6, 2018, under the user account of Luis Alberto and resolved back to a specific address in Leesburg, Virginia.  (*Id.*).  While examining banking information tied to the cell phone, law enforcement located credit information connected to Bank of America and thereafter located information for Luis Alberto Gonzales. (J.A.1416, ¶ 76).

During an interview with Minor-2, she identified photographs of the man she knew as Luis via the Facebook username Luis Figo and the Facebook ID number

ending in x4865.  (J.A.1416, ¶ 77).  Through investigation and open-source queries, law enforcement identified four more Facebook profiles under the name Luis Figo containing the same pictures of Luis.  (*Id.*).  The four additional accounts ended in Facebook id numbers x7120, x8752, x7408, and x0068.  (*Id.*).

When investigating the identity of Luis's co-conspirator Reina, Minor-2 provided a description of her as an older, heavy-set woman in her 40s with black hair to her shoulders.  (J.A.1416, ¶ 78).  Minor-2 stated Reina's apartment was located near the area where law enforcement recovered Minor-2.  (J.A.1417, ¶ 81).  Minor-2 identified the apartment unit via a photograph.  (J.A.1418, ¶82).  She noted that Reina had children aged 12 through 18 and Reina's daughter was in a relationship with Moises' brother. (J.A.1416-17, 1419, ¶¶ 79, 85).  Investigators researched the location and found an individual by the name of Reina Hernandez, with a specific date of birth putting her in her 40s, living at the apartment building identified by Minor-2.  (J.A. 1418, ¶¶ 83-84).  Additional evidence showed that Reina's daughter had a child with a sibling of Moises, the MS-13 gang member who harbored Minor-2 after her bat beating.  (J.A.1419, ¶ 85).  Numerous photographs on Facebook showed Moises' brother and Reina's daughter together.  (*Id.*).

While being exploited, Minor-2 stated she was directed to communicate with her mother and lied to her that everything was okay. (J.A.1421, ¶ 89).  Law

enforcement obtained text messages from her mother that Minor-2 had sent dated October 9, 2018. (*Id*.). The text message contained a picture of Minor-2 wearing a dress with a distinct black and white pattern while standing in a bathroom shower. (*Id*.). Minor-2 reported that Reina provided her that dress to wear and the photo was taken in Reina's bathroom. (*Id*.).

Through various databases, law enforcement located three Facebook profiles depicting Reina under three different accounts with the usernames Elizabeth Hernandez and Noel Martinez. (J.A.1419, ¶ 86). A picture tied to the Noel Martinez account was shown to Minor-2. (J.A.1419, ¶ 87). Minor-2 identified the woman as the same "Reina" who exploited her. (*Id*.). Further investigation into one of the "Elizabeth Hernandez" Facebook accounts showed a picture of Reina wearing an identical black and white patterned dress that Minor-2 reported obtaining from Reina. (J.A.1421-22, ¶ 90). Law enforcement also located a photo in Reina's Facebook pages depicting Luis in a soccer uniform with other men on a field. (JA1420, ¶ 88).

Historical cell site data tied to Luis' cell phone showed the phone near the Queenstown Apartments over 200 times from October 15, 2017 to December 9, 2018. (JA1422, ¶ 91). Location data put his phone consistently at the Queenstown Apartments from September 24 through October 16, 2018. (*Id*.).

Attachment A of the search warrants listed the specific Facebook accounts to be searched. (J.A.1424). Part I of Attachment B discussed specific items to be disclosed by Facebook. (J.A.1425-26). Part II of Attachment B discussed specific types of information to then be seized by the government, namely information that constitutes fruits, evidence, and instrumentalities of 18 U.S.C. § 1591 (sex trafficking of minors or by force, fraud, or coercion); 18 U.S.C. § 2422(a) (coercion and enticement); 18 U.S.C. § 2423(a) (transportation of a minor across state lines for purposes of prostitution or illegal sexual activity); 18 U.S.C. § 1952 (use of a means or facility of interstate commerce to promote prostitution), and any attempts or conspiracies to engage in such conduct. (J.A.1426-27).

### b. Facebook Search Warrant Tied To Moises Zelaya-Veliz, a/k/a Moizes Zelaya Bonilla, a/k/a Zelaya Hernandes

On July 12, 2019, the Honorable John F. Anderson signed a search warrant for the Facebook account "Moizes Zelaya Bonilla" along with nine other Facebook accounts involving Minor-1, Minor-2, Minor-3, and additional unindicted co-conspirators. (J.A.1428-1480).

The affidavit described law enforcement's investigation into the physical assaults and sexual exploitation of Minor-1, Minor-2, and Minor-3 by MS-13. (J.A.1144-71). The affidavit discussed MS-13's structure, law enforcement's investigation into their racketeering activities, and the manner in which the gang conducts illegal business including human sex trafficking. (J.A.1436-1440, ¶¶16-

26). The affidavit described how gang members use social media sites such as Facebook to create and post online prostitution advertisements and how gang members post messages and pictures that correspond to the location of where commercial sex acts are occurring. (J.A.1437-38, ¶¶ 16-17). The affidavit further discussed how MS-13 gang members and associates frequently use messaging applications such as Facebook to coordinate criminal activities and to communicate with one another before, during, and after engaging in criminal activities. (J.A.1438, ¶ 18). The affidavit further discussed how MS-13 members often post pictures and videos of themselves and others displaying gang hand signs and wearing gang paraphernalia to signify their membership in the gang. (J.A.1438, 1472, ¶¶ 18, 92). The affidavit described how photographs and videos posted to social media platforms can serve as circumstantial evidence of a perpetrator's guilt, and reveal, through location tagging features, that the target accounts were used in the vicinity of the exploitation of Minor-1, Minor-2, and Minor-3. (J.A.1472, ¶¶ 91-93). The affidavit provided specific examples of evidence law enforcement previously recovered from Facebook tied to this investigation, including specific communications, videos, and photos. (J.A.1438, 1441-43, 1446-47, 1452-53, 1454-68; ¶¶17-18, 31, 36-37, 49-50, 72-73, 75-77).

The affidavit provided additional information about the sexual exploitation of Minor-1 and the bat beating inflicted on Minor-3 by members and associates of MS-

13. (J.A.1469-1471, ¶¶80-90). Specifically, the affidavit described a bat beating inflicted upon Minor-3 by members of MS-13 that occurred in July 2018. (J.A.1471, ¶¶ 87-90). The affidavit further described the sexual exploitation of Minor-1 committed by MS-13 gang member Sonic through January of 2019. (J.A.1469-70, ¶¶ 80-86).

As in the prior search warrant affidavits, SA Obie described Minor-2 first being recovered by law enforcement in June 2018 after the attempted sexual exploitation by a member of MS-13. (J.A.1442, ¶ 32). The affidavit further described Minor-2 and Minor-3 running away together in August of 2018, Minor-2's subsequent bat beatings by multiple members of MS-13, and her being harbored at the residence of MS-13 gang member Moises Zelaya after the beatings for multiple days. (J.A.1442, 1444-49; ¶¶ 33, 42-49, 51, 55-56). While at his residence, Minor-2 asked for ice to tend to her wounded body and was instructed not to tell Moises's wife Wendy what happened. (J.A.1448, ¶ 55).

The affidavit further discussed conversations between Minor-2 and Wendy that law enforcement recovered from Minor-2's Facebook account. (J.A.1448-49; ¶ 56). In September 2018 communications, Minor-2 told Wendy members of MS-13 were coming to the residence and Wendy instructed her to stay in the house where Jesus would protect them. (*Id.*). In additional communications, Minor-2 sent a

photo of herself sitting in a chair outside of what appeared to be the residence of Moises and Wendy. (*Id.*).

The affidavit further described how gang members had Minor-2 stay at Moises' apartment because they planned to take her to Moises' relative located in Maryland, how Sonic and Jose then drove Minor-2 to the residence of Reina and Luis in Maryland, and the subsequent commercial sexual exploitation. (J.A.1449-1451; ¶¶ 57-59; 61-69). The affidavit further described the drugs Luis gave Minor-2, including marijuana and cocaine. (JA1451; ¶ 69).

The affidavit also described law enforcement's prior execution of multiple search warrants on Facebook accounts tied to Bonilla Gonzalez, a/k/a Sonic. (JA1447, 1454; ¶¶ 50, 75). The affidavit provided specific examples of Facebook communications recovered from Bonilla Gonzalez's accounts showing multiple MS-13 gang members discussing Minor-2, Minor-3, and the circumstances surrounding the bat beating. (J.A.1454-1468; ¶¶ 75-77).

The affidavit further described Facebook communications and photographs recovered from a prior search warrant on one of Bonilla Gonzalez's Facebook accounts. (J.A.1447, ¶50). Law enforcement recovered pictures being sent from the Moizes Zelaya Bonilla account to Sonic depicting, *inter alia*, photographs of firearms, drugs such as marijuana, individuals flashing MS-13 gang signs with their hands, MS-13 graffiti, and communications discussing the use of a gun. (*Id.*).

Attachment A of the search warrant listed the specific Facebook accounts to be searched, including the Moizes Zelaya Bonilla account. (J.A.1475). Part I of Attachment B discussed specific items to be disclosed by Facebook for the period of January 1, 2018 through present. (J.A.1476-1478). Part II of Attachment B discussed the specific types of information to then be seized by the government, namely all information described in Section I that constitutes fruits, evidence and instrumentalities of violations of the same statutory violations listed in the search warrants previously sworn out, along with 18 U.S.C. § 1959 (violent crimes in aid of racketeering). (J.A.1478-1480).

### c. Facebook Search Warrants Tied To The Remaining Appellants

On February 20, 2020, the Honorable Michael S. Nachmanoff signed search warrants for Facebook accounts belonging to Defendants Jose Eliezar Molina-Veliz, Jonathan Zelaya-Veliz, and Gilberto Morales. (J.A.1481-1592). On that same date, Judge Nachmanoff signed search warrants for the accounts tied to Defendant Santos Ernesto Gutierrez-Castro, co-defendant Nelson Caballero Portillo, co-defendant Orlando Alexis Salmeron Funez, and multiple unindicted co-conspirators.[7] (*Id.*).

The affidavit in support of the search warrants were similar to the above affidavits and incorporated information obtained from the prior Facebook search

---

[7] Gutierrez Castro did not file a motion to suppress Facebook evidence and is not challenging the search warrant on appeal.

warrant returns related to the accounts used by the three minor victims, Bonilla Gonzales, Moises Zelaya-Veliz, his domestic partner Wendy, Luis Gonzales, and Reina Hernandez. (J.A.1527, 1531, 1538, 1541, 1543-44; ¶¶ 66, 83, 110, 117, 124). The affidavits provided communications showing all of the defendants discussing the physical and/or sexual exploitation of Minor-2 and/or Minor-3. (J.A.1541, 1545-49, 1561-63, 1568-71, 1576-77, 1582-83, ¶¶ 117, 132-41, 172-75, 183-87, 200-08).[8]

Attachment A of the search warrants listed the specific Facebook accounts to be searched. (J.A.1586-87). Part I of Attachment B discussed specific items to be disclosed by Facebook for the period of January 1, 2018 through present. (J.A.1590). Part II of Attachment B described the same sexual exploitation and violent crime in aid of racketeering statutes and items to be seized as described in the search warrant tied to user Moizes Zelaya Bonilla. (J.A.1590-1592).

### d. Suppression Hearings on the Facebook Search Warrants

With the exception of Gutierrez-Castro, each defendant filed motions to suppress the Facebook evidence arguing lack probable cause, lack of particularity, and overbreadth. (J.A.113). After briefing was completed, suppression hearings were conducted. (J.A.64-177).

---

[8] Jose Eliezar Molina-Veliz, Jonathan Zelaya-Veliz, and Gilberto Morales do not challenge probable cause/sufficient nexus to their accounts on appeal. (Br. at 24).

The district court held each search warrant was supported by probable cause, with a sufficient nexus established between the Facebook accounts to be searched and the crimes under investigation. (J.A.113-16). The district court found each affidavit listed the training and experience of the affiant as it related to MS-13 criminal activity, including the various means and methods by which MS-13 gang members and their associates conduct human trafficking operations. (J.A.115). The affidavits further discussed the role of Facebook with such criminal activities, including: (1) photographs pertaining to the exploitation; (2) the communications that often occur before, during, and after that criminal activity; and (3) specific information pertaining to the use of Facebook as it related to particular defendants and particular victims. (*Id.*). The district court further held the affidavits established an extensive, ongoing criminal enterprise of uncertain beginnings and there was a substantial basis for the magistrate judges to conclude that the Facebook accounts would provide information pertaining to the crimes under investigation. (J.A.115-16). The district court found such information included photographs and communications that would depict and otherwise corroborate the statements and/or abuse of the minor victims, the defendants' aliases, the true identities of the defendants, and information on who else was involved in the criminal activity. (*Id.*).

As to overbreadth, the district court held there was probable cause to search the categories of information challenged, including defendants' likes, defendants'

security questions, GIFS, tags, privacy settings, credit card numbers, and location data outside of the offense time range. (J.A.117-18). The district court concluded there was probable cause to believe that all of the categories of information were relevant to establishing, *inter alia*, the identity and aliases of those involved in criminal activity, the substance of communications pertaining to the criminal activity, and the dates, times, places, and participants in the criminal activity. (*Id.*).

The district court further held that the warrants were not overbroad based on lack of a timeframe for earlier search warrants or the actual time frames provided in later search warrants. (J.A.118-19). The district court found that the affidavits pertained to a broader criminal enterprise that encompassed criminal activity before and beyond the time period identified by Minor-2. (J.A.119).

In the alternative, the district court found the good faith exception applied and denied the motions. (J.A.121-22, 147).

**e. Testimony and Evidence Presented at Trial**

The testimony and evidence at trial showed the seven defendants were intimately connected to each other through their membership and/or association with MS-13. (J.A.393-95, 397, 592, 711-12, 718-19, 854, 964-67). Several defendants were further related to each other through familial and romantic ties. (J.A.353-55, 357-61, 412-13, 573, 576-77, 743-45). On August 27, 2018, 13-year-old Minor-2 and 16-year-old Minor-3 ran away from a residential facility in

Fairfax County.[9]  (J.A.252).  Minor-3, a/k/a Emily Lopez Villacorta, was recovered by law enforcement after being arrested at a Target on or about September 4, 2018. (J.A.253-56).  Minor-2, a/k/a Nathasha Lopez, a/k/a Catracha, a/k/a Catrachita was recovered by law enforcement on October 11, 2018 outside the Queenstown Apartment complex in Mount Rainier, Maryland. (J.A.459, 693-94, 760-61, 907).  At that time, Luis Alberto Gonzalez, Jonathan Zelaya-Veliz, and Reina Hernandez lived in the Queenstown Apartment complex off of Chillum Road. (J.A.384, 573, 586-87).

### i.      Testimony Related to the Sex Trafficking of Minor-2 Committed by Moises Zelaya-Veliz and Jose Eliezar Molina-Veliz

Moises Zelaya-Veliz and Jose Eliezar Molina-Veliz lived together in an apartment at 1880 Gableridge Turn Drive, Woodbridge, Virginia in the Summerland Apartment complex.  (J.A.767, 770-71).  Shortly after Minor-2 and Minor-3 ran away, Minor-2 was beaten with a baseball bat in a garage as part of a gang initiation into MS-13.  (J.A.438-40).  After leaving the garage, the girls went to the apartment of Moises and Jose Eliezar.  (J.A.643-46).

During Minor-2's trial testimony, she identified photographs of Moises and Jose Eliezar as two people involved in her sexual exploitation while spending the night at their apartment.   (J.A.447-48, 451-52).  While at the apartment, Moises

---

[9] For purposes of consistency in this brief, E.B. will be referred to as Minor-2 and S.N.L.R. will be referred to as Minor-3.

had sex with her in the bathroom and Jose Eliezar had sex with her in the living room. (J.A.448, 451-52). Corroborating Minor-2, Minor-3 testified that they spent more than one night at their apartment and while there, Minor-3 saw Jose Eliezar have sex with Minor-2 in the living room. (J.A.647-49). Minor-3 also saw Moises and Minor-2 go into the bathroom to have sex. (J.A.648). Thereafter, Moises expressed his fears that he had gotten Minor-2 pregnant. (J.A.648-49).

After Minor-3's arrest at Target, Facebook location evidence and communications continued to show Minor-2's presence at the Gableridge Turn apartment at various points in time. (J.A.761-67, 798, 817, 820). Minor-2 testified that there were woods near the apartment of Moises and Jose Eliezar and five or more men had sex with her in the woods during a single day. (J.A.450-54). When shown a photo of co-conspirator Victor Alexis Emanuel Veliz, Minor-2 identified him as "Alexis," and said he was one of the men who had sex with her in the woods. She further stated Alexis was a brother of Moises. (J.A.453-54). While men were sexually exploiting Minor-2 in the woods, Moises was on his porch. (J.A.451). Based on proximity, a person on the porch is able to see the wooded area. (J.A.451, 771-72).

### ii.     Testimony Relating to the Sex Trafficking of Minor-2 Committed by Santos Ernesto Gutierrez-Castro

Defendant Santos Ernesto Gutierrez-Castro lived near the apartment of Moises and Jose Eliezar at 13406 Greenacre Drive, Woodbridge, Virginia.

(J.A.767, 776-77).  During Minor-2's testimony, she identified a photograph of him and knew him as "Gutierrez."  (J.A.457).  Minor-2 met Gutierrez while at the apartment of Moises and Jose Eliezar.  (J.A.455).  Minor-2 went to Gutierrez's house, and while there, Gutierrez provided her marijuana.  (*Id.*).  Thereafter, more than ten men had sex with her while she was in a bedroom.  (J.A.458).  She could hear Gutierrez on his phone outside the door of the bedroom telling people they would have to pay to have sex with her.  (J.A.457).  The cost was about $100 for one hour.  (J.A.457-58).  One man gave $20 directly to Minor-2 after having sex.  (J.A.456).

### iii.    Evidence Corroborating the Sex Trafficking of Minor-2 by Defendants in Early to Mid-September 2018

Facebook communications provided additional evidence of commercial sexual exploitation by Defendants described above.  Facebook communications dated September 5-10, 2018 from the accounts belonging to Gutierrez and MINOR-2 revealed: (1) Gutierrez inviting Minor-2 over to smoke marijuana; (2) a partial conversation regarding money, including a photograph of a $100 bill; and (3) a discussion about Minor-2 wanting to have sex.  (J.A.809-13).[10]   Additional communications reveal Gutierrez coordinating men to have sex with Minor-2,

---

[10] For each Facebook exhibit containing communications, SA Obie testified that the first user account listed under the top left heading "Participants" indicates which Facebook account the data came from tied to that particular exhibit.  (J.A.797-98).

including Facebook users Isai Chevez, Joseph Gotze Salinas, and Moises' brother Alexis Emanuel Zelaya. (J.A.813-30). In a *Mirandized* interview with law enforcement, Gutierrez admitted to harboring Minor-2 at his house for about four or five days and having sex with her. (S.A.4, 15-16). He also admitted to driving Minor-2 to Isai's residence in Maryland. (S.A.10-11).

Facebook communications ranging from September 11-13, 2018 show defendants Gutierrez, Moises, Luis, Jonathan, and other unindicted co-conspirators coordinating the transportation and harboring of Minor-2 at various locations in Virginia and Maryland. In the communications, Gutierrez and Moises sent photos of Minor-2 standing in a mirror with her shirt lifted and bra exposed. (J.A.832, 835-36, 839, 844). Moises offered to transport Minor-2 to Luis in Maryland in exchange for a "joint" or a "hit." (J.A.844, 847). Additional communications showed Moises talking with an individual regarding the upcoming beating and harboring of Minor-2 in a nearby apartment unit. During the conversation, the individual stated to Moises, "Those bitches only know how to fuck for money." (J.A.854-55). On September 17, 2018, Jose Eliezar sent a message to Gutierrez discussing Minor-2's concerns about not knowing whose son she had, and "whether it's yours or his or…the five hundred of us that got in line here/that we put in the line." (J.A.860-61).

### iv. Testimony Relating to the Sex Trafficking of Minor-2 Committed by Gilberto Morales, Luis Gonzales, Jonathan Zelaya-Veliz and Others

In the late summer and fall of 2018, Nelson Caballero Portillo lived at 6235 Springhill Drive, Greenbelt, MD. (J.A.569). During Minor-2's testimony, she recognized him as a person who exploited her, but she did not know his name. (J.A.476, *see also* J.A.362). She first met him when Luis took her to Nelson's apartment. (J.A.476.). Nelson paid Luis money to have sex with her. (J.A.476-77).

When shown a photo of Gilberto Morales, Minor-2 identified him as "Chapin" and stated she first met him at Nelson's residence. (J.A.478). While there, Gilberto had sex with her and paid Luis. (*Id.*). In the presence of Gilberto, Minor-2 consumed cocaine and marijuana. (J.A.483-84). Thereafter, men had sex with her. (J.A.484). When shown a photo of Orlando Alexis Salmeron Funez, Minor-2 identified him as "Salmeron." (J.A.477). Salmeron paid money to have sex with her. (J.A.483).

When shown a photo depicting Jonathan Zelaya-Veliz and Luis Gonzales together, Minor-2 identified the men as "Jonathan" and "Luis." (J.A.484). Jonathan had sex with her and paid someone. (J.A.485-86). Minor-2 could not remember who he paid or where the sexual activity occurred. (*Id.*)

During the trial testimony of Nelson Caballero-Portillo, he identified photographs of Minor-2, multiple co-defendants, and unindicted co-conspirators.

(J.A.570-78, 581). Nelson first met Minor-2 when Luis, Jonathan, and two unindicted co-conspirators told him they were going to smoke in Virginia but then came back to his apartment with Minor-2. (J.A.581-82). Minor-2 stayed for two or three days. (J.A.583). While partying in the Springhill Drive apartment, Luis sold Minor-2 for sex to Nelson in exchange for $75. (J.A. 583-85). While having sex, Nelson could see bruising on Minor-2 from the gang bat beating. (J.A.584). Thereafter, Nelson saw Gilberto pay Luis grams of cocaine to have sex with Minor-2. (J.A584-85). Nelson believed she was a minor based on her appearance. (J.A.583).

During the trial testimony of Orlando Alexis Salmeron Funez, he identified photographs of multiple co-defendants, unindicted co-conspirators, and Minor-2 (who he referred to as "Catrachita"). (J.A.352-63, 367). The first time Salmeron saw Minor-2 was at Nelson's apartment. (J.A.367). Luis told Salmeron that Moises had brought Minor-2 from Virginia to the apartment. (*Id*.). About two weeks later, Salmeron saw Minor-2 again and she was limping due to a bat beating. (J.A.369-70). While partying at the apartment, Salmeron saw Gilberto and Minor-2 go into a bedroom together. (J.A.371). After a while, they came out together and Gilberto paid Luis. (*Id*.). Salmeron also saw Nelson go into the bedroom with Minor-2. (*Id*.) After Nelson left the bedroom, he paid Luis. (371-

72).  Salmeron then had sex with Minor-2 and paid $50 to Luis.  (J.A.372).  Once sober, Salmeron believed she was a minor based on her appearance.  (J.A.382-83).

Nelson decided to kick out Luis and Minor-2 due to fears of the gang and police coming.  (J.A.381, 586).  Thereafter, Luis and Minor-2 lived at Reina Hernandez's apartment on Chillum Road.  (J.A.382-83, 573, 586-87).

### v. Evidence Corroborating The Sex Trafficking of Minor-2 By Multiple Defendants In Mid-September 2018

Facebook communications provided further evidence of the commercial sexual exploitation of Minor-2 described above.  For example, on September 21, 2018, Jose Eliezar told Jonathan, "If you are all going to come, bring 50 dollars each.  I have a girl here for you if you want to shoot a load."  Jonathan initially protested, wanting the sexual activity to be free.  When Jose Eliezar reiterated the sexual activity would not be free, Jonathan replied: "I only have coke.  Do we bring her, or is she coming here?"  (J.A.872-73).  Thereafter, Luis sought the address from Jose Eliezar stating in part, "Send me the address because we're on our way…"  Jose Eliezar sent the address of 1880 Gableridge Turn, Woodbridge, VA. (J.A.876-77).

On September 22, 2018, Minor-2 posted a photo of her bruised buttocks while standing in Nelson's bathroom.  (J.A.266, 882).  From September 22-23, 2018, videos and images were circulated on Facebook group chats showing multiple defendants with Minor-2 partying inside Nelson's apartment with alcohol,

marijuana, and cocaine, including Luis, Gilberto, Nelson, and Salmeron. (J.A.890-95, S.A.71-109). On September 23, 2018, Minor-2 posted a prostitution advertisement of herself standing in a bathroom mirror with the tag line "How much would you give me." (J.A.895-97, S.A.110-132). On September 24, 2018, Nelson informed Salmeron that he kicked out Luis and Minor-2. (J.A.898-900).

### vi. Testimony Tied To The Continued Sex Trafficking of Minor-2

In the fall of 2018, Jonathan Zelaya-Veliz, Reina Hernandez, and others lived together in an apartment located at 3368 Chillum Road, Mount Rainier, Maryland in the Queenstown Apartment complex. (J.A.353-54, 780). Minor-2 testified to spending about ten nights at the apartment with Luis and Reina. (J.A.463-64, 470). Men came over to have sex with her while Luis and Reina were present. (J.A.464, 470). At times, men paid Minor-2 directly for the sexual activity and she then provided the money to Reina. (J.A.469). She also saw men give money to Reina and Luis while in the apartment. (J.A.469-70).

Minor-2 identified a picture of Kevin Orlando Veliz as "Kevin," and stated he was Reina's son. (J.A.486-87). Kevin lived at Reina's residence. (J.A.487). Kevin paid to have sex with Minor-2, however, she could not recall where the paid sexual activity occurred. (J.A.488). She further testified that Luis had sex with her twice at Reina's apartment. (J.A.475-76). Minor-2 viewed Luis as a friend and boyfriend. (J.A.475).

Salmeron testified he picked up Luis and Minor-2 while they were staying at Reina's apartment and drove them to another male's apartment in Riverdale, Maryland. (J.A.386, 388-89). Luis escorted Minor-2 up to the apartment and then waited in the car with Salmeron. (J.A.389-90). While Minor-2 was in the apartment, a video was sent to Luis showing the male sexually penetrating E.B. (J.A.390-91). About fifteen minutes later, Minor-2 got back into the car with Salmeron and Luis. (J.A.391).

### vii. Evidence Corroborating The Sex Trafficking of Minor-2 by Multiple Defendants In Late September through October 11, 2018

While Minor-2 was harbored at the Chillum Road apartment from September 24 through October 11, 2018, Facebook communications revealed the ongoing sex trafficking of Minor-2. For example, on September 30, 2018 (00:19:16 UTC), Luis sent a message to Gilberto stating, "Chucha, do you want to stick in the quarter inch? Yes or no? Let me know right away 'cause I have a girl for you right now." (J.A.909). Testimony by Nelson and Salmeron revealed that "quarter inch" was slang for "penis." (J.A.397, 597). Later in that Facebook conversation, Gilberto responded, "Are we partners for the catrachita [little Honduran girl]? Or what the fuck?" (J.A.910).

On September 28, 2018, Kevin Orlando sent a message to Luis stating, "Hey, dude…what time are you going to come? Because your girlfriend here says that she wants to be with you right now." (J.A.904). By message dated October

3, 2018 , Luis stated to Kevin, "Fuck Kevin! …You fuck and you didn't pay.  You have to pay man.  Shit.  Just you for free?"  (*Id.,* S.A.133-34).

On October 11, 2018, Jonathan Zelaya sent messages to an unindicted co-conspirator discussing Minor-2 by name.  In the messages, Jonathan discussed wanting to go have sex with Minor-2.  (J.A.956-57).

Facebook communications recovered from Minor-2's account revealed sexually explicit photos and videos of her sent to Luis after Salmeron took them to the Riverdale apartment.  (J.A.943-44, S.A.137-44).  The communications further showed Luis sending sexually explicit screenshots of Minor-2 to Gilberto one month after her recovery.  (J.A.955).  Moreover, Luis attempted to contact Minor-2 six months after her recovery.  (J.A.948-49, S.A.146-52).

When law enforcement recovered Minor-2, she was in possession of a cell phone that had Gilberto's nickname "Chapin" and contact information saved in her phone.  (J.A.987-88).  Phone records revealed 130 phone contacts between Gilberto and Minor-2 between October 7 through October 15, 2018, with Gilberto trying to contact her after her October 11 recovery by law enforcement.  (J.A.987-89).

### viii.   Testimony of Gang Expert Detective Ray Betts

The United States presented the testimony of Detective Ray Betts, a MS-13 gang expert knowledgeable on the organizational structure of the gang, including,

*inter alia*, how the gang recruits members, generates income, and disciplines its members.  (S.A.25, 29, 33-34).  Detective Betts testified that MS-13 frequently commits various crimes to generate income for the gang, including human trafficking and narcotics distribution.  (S.A.29).   Various cliques initiate females into the gang through sexual exploitation or by being "jumped in" with a beating.  (S.A.28-31).  MS-13 also disciplines their members for violating gang rules, including beatings that last for 13 seconds, 26 seconds, or other increments of 13.  (S.A.33-34).

### ix.   Testimony of Dr. Shannon Wolf, Ph.D., LPC-S

Dr. Shannon Wolf, a licensed professional counselor with a focus on the psychology and dynamics of the sex trafficking trade, testified to the psychological dimensions of human trafficking, including the trauma bond that can arise between a trafficker and the victim.  (S.A.38-40, 43-51).   As a result of the trauma bond and psychological pain, it is common for victims to engage in delayed disclosures as to the abuse they suffered at the hands of their traffickers and to not want to discuss the exploitation they endured.  (S.A.49-53).

### x.   Testimony of Dr. Katherine Deye, M.D.

After Minor-2's recovery, she was medically examined by Dr. Katherine Deye, a child abuse pediatrician.  (S.A.55, 58).  Dr. Deye testified to her observations of MINOR-2's injuries from the bat beating, along with Minor-2's

treatment for the sexually transmitted infection chlamydia and significant pelvic inflammatory disease.  (S.A.63-70).

## Summary of Argument

The district court did not err by denying defendants' motions to suppress Facebook evidence.  Over the course of the investigation, four sets of search warrants were presented by SA Obie to three different magistrate judges.  Each magistrate judge signed the warrants.  Contrary to defendants' arguments, the affidavits in support of the search warrants established probable cause to search the accounts.  Each affidavit discussed the training and experience of the affiant regarding the criminal enterprise of MS-13 and how Facebook frequently contains evidence of the specific crimes under investigation.  The affidavits further provided specific photographs or examples of communications located in Facebook accounts relevant to the crimes under investigation.

The search warrants do not fail for lack of particularity or overbreadth.  The affidavits delineate the statutory violations under investigation and provide examples of the types of data law enforcement was permitted to seize for future use at trial.  Likewise, the search warrants were not overbroad as to the categories of information for Facebook to disclose or the various time ranges of data sought that fell outside of the indictment's time frame.  The affidavits describe a broader, complex investigation law enforcement was engaged in as to MS-13's sexual

exploitation of three minors and violent crimes in aid of racketeering. Multiple courts have rejected overbreadth challenges based on similar categories of information and time ranges of data sought.

To the extent the warrants were overbroad, the proper remedy is to strike the Facebook data that was obtained under any constitutionally infirm provision of the warrant. Based on defendants' arguments regarding the charged time frame of the indictment, the convictions should still be affirmed because the Facebook data presented at trial largely fell within that time frame. Assuming there was any Fourth Amendment violation, the *Leon* good faith reliance doctrine applies.

The district court did not err in denying Gutierrez-Castro's motion for acquittal. The testimony of Minor-2, the Facebook communications, location data, and Gutierrez-Castro's *Mirandized* statements were more than sufficient to sustain the convictions.

## Argument

**I.** **The District Court Did Not Err When It Denied Defendants' Motions To Suppress Facebook Evidence**

**A.** **Standard of Review**

This Court reviews *de novo* a district court's legal conclusions concerning a motion to suppress and reviews a district court's factual findings for clear error. *United States v. Sueiro*, 59 F.4th 132, 139 (4th Cir. 2023).

## B. Analysis

Defendants argue the Facebook search warrants presented to multiple magistrate judges lacked probable cause, lacked particularity, and were overbroad as to the time ranges and categories of information sought to be disclosed by Facebook. As described more fully below, all arguments should be rejected.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, …there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The probable cause "standard is not particularly demanding, and the evidence need not provide the officers with an air-tight case." *United States v. Ortiz*, 669 F.3d 439, 446 (4th Cir. 2012).

Courts will not "invalidate a warrant based on a 'hypertechnical rather than a commonsense' interpretation of the warrant affidavit." *Gates*, 462 U.S. at 236. Moreover, "[a] magistrate's determination of probable cause should be paid great

deference by reviewing courts." *Id*. at 236. "As always, the ultimate touchstone of the Fourth Amendment is reasonableness*." United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020). The court does not review a magistrate judge's decision *de novo*; rather the court must ascertain whether "the magistrate had a 'substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236.

### a) A Sufficient Nexus Existed Between The Facebook Accounts And The Crimes Under Investigation

The Fourth Amendment requires a sufficient nexus between "the evidence sought and the place to be searched," *United States v. Jones*, 942 F.3d 634, 639 (4th Cir. 2019), but the nexus "may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *Id*. (quoting *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988)). Indeed, "[a] sufficient nexus can exist between a defendant's criminal conduct and [the location to be searched] even when the affidavit supporting the warrant 'contains no factual assertions directly linking the items sought to the [the location to be searched]." *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005). Courts have routinely relied on such inferences in the context of electronic evidence. *See, e.g., Sueiro*, 59 F.4th at 140; *United States v. Kvashuk*, 29 F.4th 1077, 1085–86 (9th Cir. 2022).

In determining probable cause, a judge may rely on an officer's "assertion of training-and experience based knowledge" to support a nexus between criminal

activity and the place to be searched. *United States v. Jordan*, 2023 WL 2947433, at *5 (4th Cir. 2023) (unpublished) (quoting *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008) (finding probable cause narcotics would be located in a residence where no drug activity was observed based on overarching investigation and agent's training and experience that drug traffickers frequently conceal narcotics within their own residence)*; United States v. Martin,* 2021 WL 248671, at *2 (4th Cir. 2021) (unpublished) (finding sufficient nexus where affiant detailed the training and experience related to the drug trade); *United States v. Wienke,* 733 F. App'x 65, 68-69 (4th Cir. 2018) (finding probable cause can be established based on an agent's training and experience coupled with the inherent reasonableness that the items sought would be located in a particular location).

Here, the magistrate judges had a substantial basis for concluding a nexus existed between the Facebook accounts and the crimes under investigation. Each affidavit discussed the training and experience of the affiant regarding the criminal enterprise of MS-13. Each affidavit discussed the various ways and methods in which MS-13 gang members and associates conduct commercial sex operations, including how gang members and individuals involved in commercial sex frequently use social media sites such as Facebook to advertise the females involved in commercial sex and to communicate with both the females and the customers. The affidavits also discussed how gang members frequently post pictures that correspond

to the location of where commercial sex acts are occurring. The affidavits further discussed how gang members frequently use sites such as Facebook to communicate before, during, and after their crimes and to photograph themselves and fellow co-conspirators. Warrants may reach evidence that helps establish a motive, rebuts a defense that a defendant may raise at trial, or impeaches a defendant. *Messerschmidt v. Millender*, 565 U.S. 535, 551–52 (2012).

The affidavits also demonstrated how the Facebook accounts contained relevant evidence through the discussion of Facebook photographs of the targets identified by Minor-2. Based on these identifications, there was probable cause to believe that the contents of the accounts would establish the targets' true identities, relevant aliases, and provide data on the locations with where Minor-2 was trafficked. The affidavits also demonstrated the connections between the targets through the discussions of the targets' friend lists and/or group photographs located in the Facebook accounts. Such connections between targets constitute evidence of the criminal conspiracy because they corroborate the victims' statements as to who was involved in the beatings and sex trafficking. Such connections also constitute evidence tied to the formation and/or existence of the conspiracy among the individuals. Moreover, there were numerous individuals whose first or last names Minor-2 did not know who were involved with beating and sexually exploiting her.

Such group photos and friend lists constitute evidence as to the full identities of the perpetrators.

The affidavits also contained multiple specific examples of Facebook conversations demonstrating various co-conspirators' involvement with sexually exploiting and/or beating Minor-1, Minor-2, and Minor-3. The examples of Facebook conversations provided in the affidavits demonstrated the targets' and co-conspirators' involvement with MS-13, their involvement with the sexual exploitation of minors, and/or the racketeering acts under investigation. The specific examples of Facebook conversations further corroborated the training and experience of SA Obie that such evidence is often contained in Facebook accounts and the accounts are indeed frequently instrumentalities of the offenses. Accordingly, a sufficient nexus existed between the violations under investigation and the Facebook accounts. *See, e.g., United States v. Daprato*, 2022 WL 1303110, at *2-3, 7 (D.Me. 2022) (holding probable cause existed to search Facebook account stating, in part, it was reasonable to suspect that searching the account would reveal additional connections with the codefendants or victims); *United States v. Sharp*, 2015 WL 4641537, at *14 (N.D. Ga. Aug. 4, 2015) (finding sufficient nexus to search defendant's Facebook accounts in a copyright infringement investigation where offending Facebook pages carrying copyright protected material listed defendant as the owner and the offending pages linked to his separate Facebook

account); *see also United States v. Johnson*, 437 F.3d 69, 71-72 (D.C. Cir. 2006) (holding that if a defendant is connected to multiple residences, observations of illegal activity that occur outside the home can provide probable cause to search each dwelling).

### b) The Facebook Search Warrants Did Not Authorize An Unparticularized Or Overbroad Seizure

This Circuit has made clear that a warrant "may satisfy the particularity requirement *either* by identifying the items to be seized by reference to a suspected criminal offense *or* by describing them in a manner that allows an executing officer to know precisely what he has been authorized to search for and seize." *United States v. Cobb*, 970 F.3d 319, 329 (4th Cir. 2020) (quoting *United States v. Blakeney*, 949 F.3d 851, 863 (4th Cir. 2020) (emphasis in the original)); *United States v. Castro*, 881 F.3d 961 F.3d 964–65 (6th Cir. 2018). And "a warrant is not intended to impose a 'constitutional straight jacket' on investigating officers." *United States v. Manafort*, 323 F. Supp. 3d 768, 781 (E.D. Va. 2018) (citing *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010)). "The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved. Thus, a warrant that describes the items subject to seizure in broad, generic terms can be valid if the description is as specific as the circumstances and the nature of the activity under investigation permit."

*United States v. Young,* 260 F. Supp. 3d 530, 548 (E.D.Va. 2017), *aff'd in part,* 916 F.3d 368 (4th Cir. 2019); *see also Castro*, 881 F.3d at 964–65.

A review of Attachment B of all warrants reveals the specific statutes under investigation and specific categories of items and evidence to be seized in connection to the MS-13 criminal conspiracies, with the first warrant focused on violations of multiple sexual exploitation statutes and the following warrants focused on the same sexual exploitation statutes and violent crimes in aid of racketeering. Accordingly, the warrants were sufficiently particular.

### c) The Types of Data Sought From Facebook Were Not Overbroad

Defendants challenge probable cause to search the different types of Facebook data sought. Specifically, Defendants argue there was no probable cause to allow law enforcement to search categories of information from Facebook such as defendants' "likes," their Facebook security questions, News Feed Information, status updates, "gifts," "pokes," Facebook pages of which they were a "fan" of, the length of service and the means and source of any payments associated with the service (including credit card number and bank account number). (Br. at 26). The arguments should be rejected.

The Supreme Court has held that police may search for "mere evidence" in which case "probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Andresen v.*

*Maryland*, 427 U.S. 463, 483 (1976). A fair reading of the search warrant affidavits reveal that probable cause existed for the types of information requested from Facebook, all of which is relevant to establish, *inter alia*: (1) the identity and aliases of the targets along with the identity of other co-conspirators, witnesses, and victims; (2) the relationships, contacts, and communications amongst co-conspirators, victims, and/or witnesses; (3) the substance of communications; (4) the date, time, and location of where the targets and victims were during relevant communications and events; (5) visual depictions of the co-conspirators, victims, and witnesses; (6) information about linked accounts that could further aid in determining identity through subsequent search warrants; (7) the formation and continuation of the criminal conspiracy; and (8) user attribution evidence to ensure that the targets under investigation and at trial were in fact the individuals using the accounts as opposed to someone else using or hacking into the account. Courts regularly uphold warrants authorizing the seizure of these types of information. *See e.g., Young,* 260 F. Supp. 3d at 550 (noting that courts have routinely upheld warrants authorizing the seizure of information related to potential sources of evidence, including, *inter alia*, aliases used by the defendant, other internet accounts, and other physical places where the target might have hidden evidence); *Daprato*, 2022 WL 1303110, at *2-3, 7 (upholding Facebook search warrant seeking the disclosure of 17 categories of information and stating, in part, "it was reasonable to suspect that searching [the

defendant's] 'friends,' his 'likes,' and the pages of which he is a 'fan' would reveal additional connections with the codefendants or victims"); *United States v. Skinner*, 2021 WL 1725543, at *12 (E.D.Va. Apr. 29, 2021) (rejecting argument that law enforcement's search tied to location, shopping history, and online communications were overbroad, noting such information was relevant to the charges of kidnapping and child pornography and were cabined by reference to the statutes stated in the warrant); *United States v. Aboshady*, 951 F.3d 1, 8-9 (1st Cir. 2020) (rejecting arguments that searches for identity evidence showing ownership and control of six Gmail accounts belonging to the defendant were constitutionally impermissible).

Courts have denied motions to suppress Facebook and other social media evidence based on similar arguments. *See, e.g., Daprato,* 2022 WL 1303110, at *2-3, 7-8 (finding no overbreadth or lack of particularity related to a Facebook search warrant seeking disclosure of 17 categories of data); *United States v. Franklin*, 2022 WL 3572697, at * 8-9 (W.D.Mo. 2022) (rejecting particularity and overbreadth challenges to Instagram search warrant where defendant claimed law enforcement sought disclosure of the "entire" account involving a gang-related narcotics investigation); *United States v. Liburd*, 2018 WL 2709199, at *3 (E.D.N.Y. June 5, 2018) (holding due to the nature of digital media searches, it was proper for the search warrant to allow the FBI to search the entire contents of a defendant's Facebook account, even if the account also contained information unrelated to

criminal activity); *United States v. Westley*, 2018 WL 3448161, at *12 (D. Conn. July 17, 2018) (equating Facebook information to other "electronic evidence" and finding that "extremely broad" disclosure is a practical necessity when dealing with electronic evidence); *United States v. Sharp*, 2015 WL 4641537, at *15 (N.D. Ga. Aug. 5, 2015) (rejecting Facebook overbreadth arguments where Facebook disclosed the "entire cache of information" without limits based on time and stating "[t]he fact that [a] warrant call[s] for seizure of a broad array of items does not, in and of itself, prove that the warrant fails to meet this requirement of particularity."); *see also United States v. Shah,* 2015 WL 72118, at (E.D.N.C. Jan. 6, 2015) ("A number of courts have authorized the government to obtain the entire contents of an email account in order to later determine which particular emails come within the scope of a search warrant"); *United States v. Alford*, 744 Fed App'x 650, 653 (11th Cir. 2018) (finding warrant requiring disclosure of nearly all the data on a Google account proper under the circumstances because officers were attempting to identify an unknown perpetrator linked to the account).

### d) The Time Range Sought Was Not Overbroad

Defendants also contend the Facebook search warrants were overbroad because the warrants did not confine the agents search and seizure of evidence to the charged time frame of Minor-2's sexual and physical exploitation. (Br. at 2, 26). Defendants' arguments should be rejected because they ignore the broader, complex

investigation law enforcement was engaged in involving the exploitation of Minor-1, Minor-2, and Minor-3 via the criminal enterprise MS-13 that occurred over a much broader time frame and the need to identify the targets and other co-conspirators involved.

"A search warrant does not fail the particularity requirement by not explicitly articulating a time frame." *Young*, 260 F. Supp. 3d at 550. "[T]he degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *Manafort*, 323 F. Supp. 3d at 782. And in circumstances like those here, "warrants need not contain specific time limits, including when dates of specific documents relevant to the offenses at issue could not have been known to the government, or when evidence that date[s] from outside of the time period described in the warrant affidavit may be relevant to the activity within that period." *Manafort*, 323 F. Supp. 3d at 782.

Additionally, in *United States v. Allen*, 2018 WL 1726349 (D. Kan. Apr. 10, 2018), law enforcement arrested three individuals connected to a militia group and learned they were using Facebook accounts to communicate with each other and post anti-government postings. *Id.* at *1. After obtaining and executing search warrants, the Government obtained approximately 28,000 pages of Facebook records. *Id.* at *2. Defendants filed motions to suppress arguing overbreadth because the warrant sought broad categories of information that "required Facebook to disclose almost

every piece of information from each account." *Id.* at *6. The court noted that Attachment B used broad and generic terms and did not include "any temporal limitations to the information that Facebook had to disclose." *Id.* at *6. The court noted that the nature of the crime under investigation, conspiracy to use a weapon of mass destruction, permitted a broader search of Facebook communications and activities, and held the warrant was not overbroad. *Id.* at *6.

Here, the search warrants addressed the exploitation of three known minor victims over a prolonged period by the ongoing criminal enterprise MS-13 and covered multiple crimes. When the investigation first started, the Facebook search warrants tied to Luis Gonzales and his two co-conspirators, Sioni Alexander Bonilla and Reina Hernandez, contained no time limitation. The broader disclosure of information was reasonable to obtain and confirm the identities of numerous individuals involved with beating the victims with baseball bats and/or sexually exploiting the victims through the gang enterprise. Attachment B provided specific statutes and categories of information to seize.

A wider time frame was also reasonable under the Fourth Amendment to obtain evidence connected to the formation of the conspiracy and to identify co-conspirators. Through the Facebook search warrant returns, law enforcement obtained evidence of the co-conspirators' connections and the formation of the conspiracy through photographs, contacts and communications. Photographs

obtained from the accounts, including the Facebook photograph identified by Minor-2 of Gonzales and the soccer team photograph showing Gonzales and others, depicted numerous individuals ultimately identified as targets who exploited Minor-2 and corroborated statements she provided to law enforcement.

As the investigation progressed, the United States inserted a time range of January 1, 2018 through the date the warrants were sworn out for the remaining Facebook accounts. Evidence from the search warrants revealed that after Minor-2 was recovered on October 11, 2018, multiple defendants continued to use Facebook to talk to Minor-2 and/or discuss and circulate pictures of Minor-2 among themselves.

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Cobb*, 970 F.3d at 327 (4th Cir. 2020). As determined by multiple magistrate judges and the district court in this matter, the search warrants were not overly broad.

**e) The Cases Relied Upon By Defendants Do Not Involve Investigations As Complex Or Lengthy As The Investigation Underlying The Current Case**

Defendants' reliance on cases in their brief are inapposite to the complexity of the investigation underlying the current case. For example, in *United States v. Shipp,* 392 F. Supp. 3d 300, 303 (E.D.N.Y. 2019), law enforcement obtained a search warrant on Facebook while investigating the defendant for a shooting that occurred on a single day. The search warrant only sought evidence of violations of 18 U.S.C. § 922(g) (felon in possession of a firearm). In *Burns v. United States,* 235 A.3d 758,

767-68 (D.C. 2020), law enforcement obtained a local search warrant on the defendant's phone for his involvement in a shooting that occurred on a single day with a single victim. The search warrant sought evidence of violations of DC Code Section 22-2201 (First Degree Murder). In *United States v. Winn*, 79 F. Supp. 3d 904, 910 (S.D. Ill. 2015), law enforcement obtained a state search warrant on a cell phone seeking evidence of public indecency after the defendant used his cell phone on a specific day to photograph or videotape young girls. In *United States v. Blake*, 868 F.3d 960 (11th Cir 2017), law enforcement arrested two individuals for child sex trafficking and thereafter sought search warrants on the two defendants' Facebook accounts. The court assumed, without holding, that the warrants were overbroad and stated, "the warrants could have limited the request to messages sent to or from persons suspected at that time of being prostitutes or customers. And the warrants should have requested data only from the period of time during which [the defendant] was suspected of taking part in the prostitution conspiracy." *Id.* at 974.

Contrary to the cases defendants cite to, the Facebook search warrants involved in this matter involved a much broader conspiracy involving numerous perpetrators tied to the physical and sexual exploitation of multiple minors by MS-13, along with racketeering acts the members and associates engaged in.[11]

---

[11] Some of the perpetrators full identities tied to the underlying investigation have remained unidentified.

Accordingly, the magistrate judges had a substantial basis for authorizing the search warrants in the manner they did. Based on the facts and circumstances of this investigation, it would be unreasonable and unduly restrictive to limit the searches to the period in which Minor-2 was missing (from August 27 through her recovery on October 11, 2018). Such a limitation would constitute a "constitutional straight jacket" that this Circuit's case law prohibits. *Williams*, 592 F.3d at 519; *see also Manafort*, 323 F. Supp. 3d at 782 ("less temporal specificity is required here than in other contexts where evidence can more readily be confined to a particular time period").

Indeed, this Court has rejected claims of overbreadth and lack of particularity in different, yet analogous, contexts. For example, in *United States v. Jones*, 952 F.3d 153, 159-60 (4th Cir. 2020), this Court rejected "a too-cramped understanding of a proper warrant" and recognized that a suspect who placed a smoldering marijuana joint in his kitchen trash bin provided a substantial basis for a magistrate judge to authorize a search of the entire house for narcotics, including safes and locked boxes. In *United States v. Williams*, 592 F.3d 511 (4th Cir. 2010), this Court rejected a defendant's overbreadth challenge involving a search warrant for his computer devices. This Court stated, in part, "[t]o conduct that search, the warrant impliedly authorized officers to open each file on the computer and view its contents, at least cursorily, to determine whether the file fell within the scope of the warrant's

authorization – *i.e.*, whether it related to the designated Virginia crimes [under investigation]." *Id.* at 521-22. This Court further held, "At bottom, we conclude that the sheer amount of information contained on a computer does not distinguish the authorized search of the computer from an analogous search of a file cabinet containing a large number of documents." *Id.* at 523. *See also Cobb*, 970 F.3d at 328-30 (rejecting arguments that agents must explain the file type or location of data within a computer under facts and circumstances of the murder investigation); *United States v. Ray*, 541 F. Supp. 3d 355, 399 (S.D.N.Y. May 26, 2021) (declining to follow the Eleventh Circuit's *Blake* decision stating, "[c]ourts in this Circuit … have uniformly held that law enforcement need not rely upon an email host company or any other private party to sift through emails to determine what is relevant and that it may obtain a warrant to request all emails from an account."); *United States v. Pugh*, 2015 WL 9450598, at *27 (E.D.N.Y. Dec. 21, 2015) (finding "the temporary seizure of the entire Facebook account does not render the search invalid"); *United States v. Ulbricht*, 858 F.3d 71, 102 (2d Cir. 2017) (rejecting particularity challenges to Google, Facebook, and digital device search warrants and noting by way of comparison "a warrant may allow the government to search a suspected drug dealer's entire home where there is probable cause to believe that evidence relevant to that activity may be found anywhere in the residence.")

**f) Even if the Warrants Were Overbroad, the Doctrine of Severance Applies**

Defendants' argument that all evidence should have been suppressed due to alleged overbreadth is contrary to the law in this Circuit. (Br. at 34). Even assuming overbreadth, such infirmity does not doom the entire warrant. *See Cobb*, 970 F.3d at 330. "Under the severance doctrine, 'the constitutionally infirm portion' of a warrant – usually for lack of particularity or probable cause – is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted." *Cobb*, 970 F.3d at 330; *see also Castro*, 881 F.3d at 965 ("The remedy is to sever the offending phrase from the warrant, suppress any evidence collected under it, and admit the evidence collected under the valid portions that remain.")

Here, defendants argue the Facebook data should have been limited to the charged time frame of Minor-2's exploitation, from August 27 through October 11, 2018. (Br. at 2). A review of the admitted trial exhibits containing data obtained from the search warrants on defendants' Facebook accounts reveals that the data was almost exclusively date stamped from August 27 through October 11, 2018. (J.A.1245-57). Assuming any evidence obtained from Facebook outside of the charged timeframe is deemed overbroad, the convictions should still be affirmed.

**g) Even if the Warrants Were Flawed, The Good Faith Exception Applies**

To the extent the Fourth Amendment was violated, the *Leon* good faith reliance doctrine applies.  A court should not suppress the fruits of a search conducted under the authority of a "subsequently invalidated" warrant, unless "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon,* 468 U.S. 897, 922 (1984).

District and appellate courts throughout the country have upheld similar search warrants by finding no Fourth Amendment violation or by finding good faith reliance.  *See, e.g., Daprato,* 2022 WL 1303110, at *2-3, 7-8 (no Fourth Amendment violation related to a Facebook search warrant that sought 17 categories of information);  *Franklin,* 2022 WL 3572697, at * 8-9 (no Fourth Amendment violation with Instagram search warrant allegedly seeking "entire" account); *Allen,* 2018 WL 1726349, at * 1-2, 6 (no Fourth Amendment violation with Facebook search warrant with no time range limit that resulted in 28,000 pages of records); *Ray,* 541 F. Supp. 3d at 400 (rejecting *Blake* decision);  *United States v. Burkhow,* 2020 WL 589536, at *10 (N.D. Iowa Feb. 6, 2020) (stating "[t]he Court acknowledges that setting reasonable temporal limitations can be difficult and varies based on the specific facts of the case"); *United States v. Chavez,* 423 F. Supp. 3d 194, 208  (W.D.N.C. 2019) (finding good faith reliance).

Accordingly, the district court did not err when it found in the alternative that the *Leon* good faith exception applied.

### h) Even if the District Court Erred In Its Suppression Rulings, Such Errors Were Harmless As to Luis Gonzales and Gilberto Morales

Assuming the district court erred with its suppression rulings, such error was harmless as to Luis Gonzales and Gilberto Morales. *United States v. Ford,* 986 F.2d 57, 60 n.2 (4th Cir. 1993) (applying harmless error to denial of suppression motion). Separate from the Facebook records obtained via search warrants from defendants' accounts, the evidence presented at trial was overwhelming as to Luis and Gilberto based on, *inter alia,* witness testimony, data obtained from the Facebook accounts of Minor-2 and unindicted co-conspirators, phone evidence, and phone records.

Nelson, Salmeron and Minor-2 all testified that Luis sold Minor-2 for sex to Gilberto and others in exchange for cash and cocaine while at Nelson's apartment. Photographs and videos corroborated the testimony, including photographs and videos obtained from the Facebook account of Salmeron, showing Minor-2 at Nelson's with defendants in possession of alcohol, cocaine, and marijuana. (J.A.890-95, S.A.71-109). A prostitution advertisement was posted through Minor-2's Facebook account, showing her inside Nelson's bathroom while Luis was selling her for sex in that apartment. (J.A.895-97, S.A.110-132). Salmeron also testified to driving Gonzales and Minor-2 to a Riverdale apartment where a video of Minor-2

being sexually exploited was then sent to Luis over Minor-2's Facebook account. (J.A.386-391). Corroborating Salmeron were the communications, photos, and videos sent via Minor-2's account to Luis. (S.A.137-44). Facebook data from unindicted co-conspirators' Facebook accounts provided further evidence against Luis, including statements found in the account of Kevin Orlando where Luis chastised him for not paying for sex. (J.A.904, S.A.133-34).

When law enforcement recovered Minor-2, she was in possession of a cell phone that had Morales' contact info saved. (J.A.987-88). Phone records revealed 130 phone contacts between Morales and Minor-2 between October 7 through October 15, 2018. (J.A.987-89). Based on multiple witnesses' testimony and corroborating evidence as to Luis and Gilberto, any error in admitting the challenged Facebook evidence was "harmless beyond a reasonable doubt." *United States v. Abu Ali*, 528 F.3d 210, 256 (4th Cir. 2008).

## II. The District Court Did Not Err When It Denied Gutierrez-Castro's Motion for Judgment of Acquittal

### A. Standard of Review

This Court reviews the denial of a motion for a judgment of acquittal *de novo*. *United States v. Gallimore*, 247 F.3d 134, 136 (4th Cir. 2001). This Court is obliged to sustain a guilty verdict if, viewing the evidence in the light most favorable to the prosecution, the verdict is supported by substantial evidence. *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

**B. Analysis**

Defendant Gutierrez-Castro's sufficiency challenges misstate the record and should be rejected. (Br. at 39-40). As shown at trial, Minor-2 testified he sold her for sex to more than ten men. Facebook communications obtained through the accounts of Gutierrez and Minor-2 showed Gutierrez communicating with Minor-2 and coordinating commercial sex transactions with multiple men, including Isai Chevez. In a *Mirandized* interview, Gutierrez admitted to harboring Minor-2 for multiple days, having sex with her, and transporting Minor-2 to Isai in Maryland. Facebook data also showed Gutierrez circulating pictures of Minor-2 to other co-conspirators working to harbor and further exploit her. Based on the evidence presented, there was no error by the district court.

## Conclusion

For the foregoing reasons, this Court should affirm defendants' convictions.

Respectfully submitted,

Jessica D. Aber
United States Attorney

_____/s/_____
Maureen C. Cain
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Ave.
Alexandria, VA 22314-5794
Phone: (703) 299-3892
Fax: (703) 299-3980
Email: Maureen.Cain@usdoj.gov

## Statement Regarding Oral Argument

The United States respectfully suggests that oral argument is not necessary in this case.  The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

**Certificate of Compliance**

I certify that I wrote this brief using 14-point Times New Roman typeface and Microsoft Word 2010.

I further certify that this brief does not exceed 13,000 words (and is specifically 12,649 words) as counted by Microsoft Word, excluding the table of contents, table of citations, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

_____/s/_____
Maureen C. Cain
Assistant United States Attorney

**Certificate of Service**

I certify that on August 7, 2023, I filed electronically the foregoing brief with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to all counsel of record.

By:     _____/s/_____
        Maureen C. Cain
        Assistant United States Attorney
        Eastern District of Virginia
        2100 Jamieson Ave
        Alexandria, Virginia 22314
        (703) 299-3892